NO. 19-30193

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent - Appellee, | ) |
| | ) |
| vs. | ) |
| | ) |
| LEX BENNETT GOODWIN | ) |
| | ) |
| Defendant - Appellant. | ) |
| | ) |

Appeal from the United States District Court
for the District of Idaho, District Court No. 4:17-CR-296-DCN
The Honorable David C. Nye Presiding

APPELLANT'S EXCERPTS OF RECORD
VOLUME 1

Andrew Parnes
Law Office of Andrew Parnes
P.O. Box 5988
671 N First Avenue
Ketchum, Idaho 83340
Phone: (208) 726-1010
Fax:    (208) 726-1187
aparnes@mindspring.com

Attorney for Defendant - Appellant
Lex Bennett Goodwin

INDEX OF APPELLANT'S EXCERPTS OF RECORD

VOLUME 1

JUDGMENT
  August 12, 2019 (Dkt. No. 76) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SENTENCING TRANSCRIPT
  August 12, 2019 (Dkt. No. 88) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MEMORANDUM DECISION AND ORDER
  May 13, 2019 (Dkt. No. 54). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

VOLUME 2

NOTICE OF APPEAL,
  August 22, 2019 (Dkt. No. 78) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

TRANSCRIPT OF JURY TRIAL DAY 2,
  May 21, 2019 (Dkt. No. 85). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

VOLUME 3

TRANSCRIPT OF JURY TRIAL DAY 3
  May 22, 2019 (Dkt. No. 86). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

TRANSCRIPT OF JURY TRIAL DAY 4
  May 23, 2019 (Dkt. No. 87). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 449

NOTICE OF ENHANCED PENALTIES
  February 5, 2019 (Dkt. No. 26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 536

SECOND SUPERSEDING INDICTMENT,
  July 24, 2018 (Dkt. No. 17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542

SUPERSEDING INDICTMENT,
  January 23,2018 (Dkt. No. 3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 550

i

INDICTMENT
  October 24, 2017 (Dkt. No. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 554

DOCKET 17-cr-296- DCN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

AO 245B (Rev. 03/18) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Idaho

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| LEX BENNETT GOODWIN | ) | Case Number:    0976 4:17CR00296-001 |
| | ) | USM Number:    19479-023 |
| | ) | |
| | ) | Manuel Murdoch |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐   pleaded guilty to count(s) _____

☐   pleaded nolo contendere to count(s) _____
     which was accepted by the court.

☒   was found guilty on count(s)   One through Eight of the Second Superseding Indictment
     after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 § 2251(a) and (e) | Sexual Exploitation of a Minor | 08/03/2017 | 1 |
| 18 § 2251(a) and (e) | Sexual Exploitation of a Minor | 08/12/2017 | 2 |
| 18 § 2251(a) and (e) | Sexual Exploitation of a Minor | 08/13/2017 | 3 |
| 18 § 2251(a) and (e) | Sexual Exploitation of a Minor | 09/30/2017 | 4 |
| 18 § 2251(a) an (e) | Attempted Sexual Exploitation of a Minor Child | 08/13/2017 | 5 |
| 18 § 2252A(a)(1) | Transportation of Child Pornography | 09/30/2017 | 6 |
| 18§2252A(a)(5)(B) and (b)(2) | Possession of Child Pornography | 10/06/2017 | 7 |
| 18§2260A | Penalties for Registered Sex Offender | 09/30/2017 | 8 |

AO 245B (Rev. 03/18) Judgment in a Criminal Case
Sheet 1

Judgment—Page    Page **2** of **8**

The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s) _____

☐  Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

August 12, 2019
_____
Date of Imposition of Judgment

_____
Signature of Judge

David C. Nye, Chief United States District Judge
_____
Name and Title of Judge

August 13, 2019
_____
Date

002

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 2-Imprisonment

DEFENDANT:       Lex Bennett Goodwin
CASE NUMBER:  0976 4:17CR00296-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: 100 years.

Counts One through Five, 50 years plus the mandatory consecutive sentence of 10 years pursuant to 18 § 2260A on each count. Counts One through Five to run concurrently, for an effective sentence of 60 years.

Counts Six, 40 years and Count Seven, 20 years, to run concurrently with each other, but consecutive to Counts One through Five, for a total sentence of 100 years.

☐   The court makes the following recommendations to the Bureau of Prisons:

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m.   ☐ p.m.    on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

_____
By:       DEPUTY UNITED STATES MARSHAL

003

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 3-Supervised Release

DEFENDANT:       Lex Bennett Goodwin
CASE NUMBER:     0976 4:17CR00296-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :     Life.

This term consists of terms of life on each of Counts One through Seven, all such terms to run concurrently.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release on supervision and to a maximum of 5 periodic drug tests a month thereafter for the term of supervision as directed by the probation officer. The cost to be paid by both the defendant and the government based upon the defendant's ability to pay.

   ☒   The above drug testing condition is suspended, based on the courts determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

4. ☒   The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*
5. ☒   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*
6. ☐   The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*
7. ☒   You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(Check, if applicable.)*
8. ☒   You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9. ☐   If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10. ☒   You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

004

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 3A-Supervised Release

Judgment—Page **Page 5 of 8**

| | |
|---|---|
| DEFENDANT: | Lex Bennett Goodwin |
| CASE NUMBER: | 0976 4:17CR00296-001 |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

Upon a finding of a violation of supervision or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

A U.S. probation officer has instructed me on the conditions specified by the Court. I fully understand the conditions and have been provided with a written copy of this judgment containing these conditions.


Defendant's Signature _____ Date _____

U.S. Probation Officer/Witness _____ Date _____

005

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 3B-Supervised Release

DEFENDANT:           Lex Bennett Goodwin
CASE NUMBER:      0976 4:17CR00296-001

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall submit his or her person, property, house, residence, vehicle, papers, computers (as defined in 18 § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

The defendant may not possess or use a computer (as defined in 18 § 1030(e)(1)) without prior permission from the probation officer.

The defendant shall comply with the requirements of the United States Probation Computer Monitoring Program as directed. The defendant shall consent to the United States Probation Office conducting ongoing monitoring of his computer(s), hardware, software, and other electronic devices/ media. The monitoring may include the installation, at the defendant's expense, of hardware or software systems which allows evaluation of his computer use. Monitoring may also include the retrieval and copying of all data from his computer or other electronic devices/ media. Monitoring may occur at any time with or without reasonable suspicion of violations of supervised release or probation.

The defendant shall participate in a program of mental health treatment, as directed by the probation officer. The cost to be paid by both the defendant and the government based upon the defendant's ability to pay.

The defendant will participate, at the direction of his probation officer, in an evaluation for sexual deviancy by a qualified mental health professional who is experienced in treating and managing sexual offenders. The defendant agrees to waive any right to confidentiality and allow the treatment provider to supply a written report to the United States Probation Office.

The defendant will successfully complete any course of treatment related to his offense, as directed by the probation officer, including but not limited to cognitive/behavioral treatment for sexual deviancy under the direction of a qualified mental health professional who is experienced in treating and managing sexual offenders. The defendant shall follow the rules of the treatment program as if they are the orders of the Court. The cost to be paid by both the defendant and the government based upon the defendant's ability to pay.

The defendant will participate in polygraph testing at the direction of the probation officer and/or treatment staff to monitor compliance with treatment conditions and supervised release conditions specific to the supervision of a sex offender. The cost to be paid by both the defendant and the government based upon the defendant's ability to pay.

Throughout the term of supervised release, the defendant shall participate in GPS monitoring, at the discretion of the probation officer, to ensure that the defendant does not frequent restricted locations. The cost to be paid by both the defendant and the government based upon the defendant's ability to pay.

The defendant shall not knowingly have unsupervised contact with children under the age of eighteen without the written approval of his probation officer, and only in the company of an adult approved by the probation officer and treatment provider who is trained to serve as a chaperone for sexual offenders.

The defendant will not reside or loiter within 500 feet of schoolyards, parks, playgrounds, arcades or other places primarily used by children under the age of eighteen.

The defendant may not engage in any paid occupation, vocation, volunteer service or calling that exposes him either directly or indirectly to minors, unless approved in advance by his probation officer.

The defendant will not possess any obscenity, or sexually explicit or nudist visual material involving minors, or persons who appear to be minors, nor shall he knowingly patronize any place where such material or entertainment is available.

The defendant shall not possess any written text material describing sex with minors, except that which may be necessary to complete sex offender treatment (e.g., treatment journals, sexual autobiography), and to prepare collateral challenges to aspects of the defendant's case and/or sentence (e.g., presentence report, statutes, case law).

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

006

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 5- Criminal Monetary Penalties

Judgment—Page    Page **7** of **8**

DEFENDANT:     Lex Bennett Goodwin
CASE NUMBER:    0976 4:17CR00296-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** | **JVTA Assessment*** |
|---|---|---|---|---|
| **TOTALS** | **$800** | **No fine** | **$5,000.00** | **$35,000** |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Carol L. Hepburn Esq.<br>Attn: "Tara" Series | $2,000.00 | | |
| Deborah A. Bianco in trust for "Pia"<br>14535 Bellevue-Redmond Road, Suite 201<br>Bellevue, WA 98007 | $1,000.00 | | |
| Deborah A. Bianco in trust for "Ava"<br>14535 Bellevue-Redmond Road, Suite 201<br>Bellevue, WA 98007 | $1,000.00 | | |
| Deborah A. Bianco in trust for "Mya"<br>14535 Bellevue-Redmond Road, Suite 201<br>Bellevue, WA 98007 | $1,000.00 | | |
| **TOTALS** | $5,000.00 | $ | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒   the interest requirement is waived for the   ☐ fine   ☒ restitution.

    ☐   the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

007

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 6- Schedule of Payments

|  | Judgment—Page | Page **8** of **8** |
|---|---|---|

DEFENDANT: Lex Bennett Goodwin
CASE NUMBER: 0976 4:17CR00296-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $ _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, ☒ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☒ Special instructions regarding the payment of criminal monetary penalties:

While in custody, the defendant shall submit nominal payments of not less than $25 per quarter pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

During the term of supervised release, the defendant shall submit nominal monthly payments of 10% of gross income, but not less than $25 per month, unless further modified by the Court. The defendant shall pay any special assessment or financial obligation owing to the Clerk of the Court, 550 W Fort Street, Boise, ID 83724.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:
As ordered by the Court, pursuant to the forfeiture allegation.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA Assessment (8) penalties, and (9) costs, including cost of prosecution and court costs.

```
1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF IDAHO

3   UNITED STATES OF AMERICA,    )
                                 )   Case No. 4:17-cr-296-DCN
4              Plaintiff,        )
                                 )   Pocatello, Idaho
5        vs.                     )   August 12, 2019
                                 )   2:59 p.m.
6   LEX BENNETT GOODWIN,         )
                                 )   Sentencing
7   _____)

8                      TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE DAVID C. NYE
9              UNITED STATES DISTRICT COURT CHIEF JUDGE

10

11  APPEARANCES:

12  For the Government:

13             KASSANDRA MCGRADY, AUSA
               United States Attorney's Office
14             District of Idaho
               800 Park Boulevard, Suite 600
15             Boise, ID 83712
               208-334-1155
16
               JOHN CHRISTOPHER SHIRTS, AUSA
17             United States Attorney's Office
               District of Idaho
18             801 East Sherman Avenue
               Pocatello, ID 83201
19             208-478-4166

20

21  Also present:  Brad Roedel, DHS, Tonya McDonald, USPO

22

23  Court Reporter:  Katherine Eismann, CRR, RDR
                      katherine_eismann@id.uscourts.gov
                      702-409-3556
24

25  Proceedings reported by machine shorthand.  Transcript produced
    by computer-aided transcription.
```

2

1  Appearances continued:

2  For the Defendant:

3          MANUEL TRAVIS MURDOCH, ESQ.
           Murdoch Law Office, PLLC
4          P.O. Box 822
           Blackfoot, ID 83221
5          208-785-1650

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          (Thursday, August 12, 2019, 2:59 p.m.)

2                           --oOo--

3                    P R O C E E D I N G

4          THE COURT:  Please be seated.

5          COURTROOM DEPUTY:  The Court will now hear the

6   sentencing in Case Number 17-cr-296, United States of America

7   versus Lex Bennett Goodwin.

8          THE COURT:  Good afternoon.  Counsel --

9          MR. MURDOCH:  Good afternoon, Your Honor.

10         THE COURT:  -- if you will identify yourselves for

11  the record, please.

12         MS. MCGRADY:  Kassandra McGrady for the United

13  States.

14         MR. SHIRTS:  John Shirts for the United States, Your

15  Honor.

16         MR. MURDOCH:  Manuel Murdoch for the defense.

17         THE COURT:  Thank you.

18         In this case, the defendant was convicted by a jury

19  of Counts One through Eight of the second superseding

20  indictment.

21         The Court ordered a presentence investigation report.

22  It has been provided to the Court and to counsel.  Today is the

23  day set for sentencing in this matter.

24         I have received several documents submitted by

25  counsel in advance of the hearing.  Specifically, I have

4

1    received victim impact statements, sentencing memorandums from

2    both the government and the defense, and a stipulation

3    regarding restitution.

4          Are there any other documents or letters that need to

5    be submitted today?

6          MS. MCGRADY:  No documents, Your Honor.

7          MR. MURDOCH:  No, Your Honor.

8          THE COURT:  All right.  Does the government intend to

9    have somebody give statements today?

10         MS. MCGRADY:  Your Honor, we do have a victim's

11   impact statement from Karisa Tingey.

12         THE COURT:  Okay.  And how about the defense?  Are

13   you going to have anybody give a statement?

14         MR. MURDOCH:  I believe my client will elocute.

15   Other than that, no.

16         THE COURT:  Okay.  Well, let's do the statement now

17   then.

18         MS. MCGRADY:  Yes, Your Honor.

19         THE COURT:  If you will start with your name, please,

20   for the record.

21         THE WITNESS:  Sure.  My name is Karisa Tingey.  I

22   dated Lex for roughly three years.  It would have been three

23   years the January following when he was put in jail.

24         I am the mother of two of the girls that Lex took the

25   pictures of.  We -- Lex and I were engaged and planning on

1   getting married the fall of 2017.  We had made plans for our

2   future together.  We had been together, like I said, for nearly

3   three years.  And we had one child together, and we had just

4   discovered that we were expecting another.

5           Because of Lex and all of his actions, I have trust

6   issues.  Even before this, I had trust issues, but this kind of

7   escalated it.  The beginning of our relationship was hard.  We

8   were working on my issues, and we had finally gotten to a point

9   where I was comfortable with him, and with him being around my

10  children, and him being at my home.

11          I finally felt like I could trust him.  And then

12  October 6th of 2017 rolled around, and not only my world but my

13  children's world was shattered also.  In my entire life, I have

14  known never been so humiliated.  I had never seen a search

15  warrant up to this point.  I had never had any trouble with the

16  law beyond a speeding ticket.  Because of Lex and his

17  decisions, I have been served with not one but with two search

18  warrants.

19          October 6th, I was shown the first picture of many of

20  my baby, who was about 16 months -- between 16 and 18 months at

21  the time, being used.  I had all of these strangers going

22  through my home, mine and my children's safe space where we

23  would go, you know, just to be us and to get out of the world.

24  And the day that this search warrant was served, my children

25  were there, all of them.

1          Because of Lex and his decisions, that safe place was

2     not a safe place anymore.  Their home was violated, for lack of

3     a better word.  Those first two days were incredibly rough.  I

4     was somewhere around the third month in my pregnancy, and I

5     personally couldn't understand how someone could do this.  I

6     continue wrap my mind around it.

7          The man I had chosen to be around my children turned

8     out to be something he had promised me that he wasn't.  The man

9     I had fallen in love with and was building a life with turned

10    out to be a monster.  I hate to use that word, but it is the

11    only word that I can feel fit for someone who could do this to

12    not only any child but his own child.

13          Again, my world was shattered.  My faith in men gone.

14    I can honestly say that up to that point, I had never been so

15    betrayed.  When I was served with the second search warrant, I

16    was a little bit relieved, because my older three children were

17    with their dad and wouldn't have to go through the whole ordeal

18    again with all of the investigators and all of the agents

19    coming into our home and going through our stuff.

20          The investigator and I sat down at my table, where he

21    proceeded to show me more pictures, pictures that there was no

22    doubt in my mind were my daughter.  Well, both of my daughters.

23    There was no doubt that the baby in the pictures was mine.  I

24    felt so sick.  I wanted to slam the laptop closed that the

25    investigator had put in front of me and kick everyone out and

1  find myself a nice deep hole to live in.

2          I kept trying to figure out how a father could do

3  this to his own daughter.  How could a man do this to any

4  child.  How could such evil have been so close, and I didn't

5  recognize it.

6          I feel, as a mother, I should have been able to, I

7  mean, in essence, smell that out.  The pictures that were shown

8  to me in November, when that second search warrant was served,

9  gave me nightmares.  I didn't sleep for weeks.  Every time I

10  closed my eyes, I saw these pictures.  Then I would be sick and

11  cry all over again.  Even to this day, sometimes I still have

12  the nightmares about these pictures and what he was able to do

13  under my nose.

14          I don't understand how I allowed this person into my

15  home with my innocent children and how I, as their mother, had

16  been so blind.  The purpose of this second search warrant was

17  to gather items -- thank you -- that had been in the pictures.

18  My poor child was upset when she saw her favorite stuffed toy

19  was being hauled away.  And you cannot replace a girl's best

20  friend.  Try as I might, nothing comforted her the way that

21  that owl did.

22          I wanted this whole thing to be over.  I wanted no

23  part in all of this legal stuff.  I just wanted to move forward

24  with my life and take care of my kids.  I managed to lock it

25  all away and never talk about it.  No one wanted to hear about

8

1    it or how I felt about all of it, so I just saw -- so it just

2    sat in the back of my mind deep in the shadows.  I still dealt

3    with the trust issues, and I struggled leaving my kids with

4    really anyone.  But the kids and I were managing pretty well

5    considering.

6         Much to my dismay, I started receiving phone calls

7    from the investigators.  The phone calls brought everything

8    back up to the surface.  Every time it has made moving on with

9    my life hard and nearly impossible.

10        I don't blame the agents and the investigators and

11   the state.  I understand that they were just doing their jobs.

12   I appreciate every single one of them and everything they have

13   done for my children.  Without them doing what they do, I can't

14   even imagine what would have happened.

15        I don't want to stand up here and whine.  I don't

16   want you to feel sorry for me.  What I do want is to express

17   that this process and the past two years has caused nothing but

18   chaos, chaos that could have been avoided if Lex had made

19   better choices.

20        I have been told that there is no reason for me to be

21   up here saying the things I am saying.  These people have no

22   idea what it's been like.  I've got to stand up here and speak

23   for my two daughters that were victimized by a person that they

24   both loved and trusted.  If I did not get up here and give them

25   a voice, who would?

1    I would like for you to know that this hasn't only

2 affected my children but me as well.  I don't look at people

3 the same as I did before.  I have seen what a loving father is

4 capable of doing to his own child.  Lex will have anyone

5 believe that he is innocent.  He's tried feeding me this lie

6 repeatedly the past two years.

7    However, I have put my daughter in counseling since

8 trial, and the counselor informed me that the behaviors she is

9 having are those of someone who has been sexually abused.  I am

10 going to do everything I need for her, my child -- sorry --

11 everything I need for my child, but I honestly believe that she

12 will never be the same.  She is always going to have to deal

13 with what her own father did to her.

14    Something else that I have been struggling to deal

15 with that people don't understand is I am now grouped into the

16 same group as Lex and those like him.  It's incredibly

17 embarrassing and heartbreaking.  I would never have allowed him

18 around me or my children if I had known.

19    Lex is a master manipulator with a silver tongue.  It

20 is unreal what he is capable of doing.

21    MR. MURDOCH:  Your Honor, if I'm -- excuse me.  I

22 believe we're getting beyond the scope of how this has affected

23 her and her comments about what my client is and how he

24 operates, and I would just ask that that portion be stricken.

25    THE COURT:  Do you want to respond that?

1          MS. MCGRADY:  Your Honor, this is an appropriate

2    victim's impact statement.  Victims are supposed to have wide

3    latitude in their comments to the Court.  She is expressing on

4    his characteristics, which I think is appropriate, as she knows

5    him very well.  And the manipulation is part of how he was able

6    to commit this offense.

7          THE COURT:  You may continue.  I will ask you not to

8    go too far down that road, but you may continue.

9          THE WITNESS:  I have been trying to look forward to

10   the future.  Hopefully, a future that does not include having

11   to fight with Lex.  I hope that Lex is going to be spending the

12   rest of his natural life in prison.  I plan to eventually

13   terminate his parental rights to both of the girls that he

14   fathered with me.

15          Thank you, Your Honor.

16          THE COURT:  Before you sit down, I don't want you to

17   think you have to not say everything you were going to say.

18          THE WITNESS:  That was it.

19          THE COURT:  This is your chance to speak.  Did you

20   say everything?

21          THE WITNESS:  (Nods head.)

22          THE COURT:  Okay.  Thank you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Mr. Murdoch, did the defendant have an

25   opportunity to read the presentence investigation report?

1          MR. MURDOCH:  Yes, Your Honor.

2          THE COURT:  And did you have an opportunity to go

3    over that report with him?

4          MR. MURDOCH:  I did.

5          THE COURT:  And from what I gather, you do not intend

6    to have anybody give statements other than your client.

7          MR. MURDOCH:  That is correct.

8          THE COURT:  All right.  There was an objection filed

9    by the defense.  My memory, though, is that probation agreed

10   with that objection and removed certain paragraphs from the

11   presentence report.

12         Mr. Murdoch, do you see a need to say anything

13   further about that objection?

14         MR. MURDOCH:  Your Honor, about that specific, the

15   specific objections, no.  There are a couple of clarifications

16   that we would like to make to the report.  That after speaking

17   with probation, making the changes, and then going back to my

18   client, they just didn't quite come out.  And so we're not

19   seeking to make changes to the report, but I am -- my intention

20   would be to clarify a couple of things with the Court.

21         THE COURT:  And do you want to do that now or as part

22   of your sentencing recommendation?

23         MR. MURDOCH:  I could do it as part of the sentencing

24   recommendation.

25         THE COURT:  Let's do that.

1    Counsel for the government, do you want to make any

2  remarks regarding sentencing recommendations?

3    MS. MCGRADY:  Yes, Your Honor.  Thank you.

4    We did file a stipulation for restitution, so I would

5  ask the Court order the restitution that is set forth in that

6  stipulation.  It relates to four victims that were depicted in

7  files of child pornography that were found during the forensic

8  examination of the electronic devices.

9    THE COURT:  And was that $5,000?

10    MS. MCGRADY:  Correct.  And I just wanted to note for

11  the record that those amounts were agreed to with consultation

12  with victims' representation.  Three victims were represented

13  by an attorney and then the other victim was -- wanted her mom

14  to communicate on her behalf, and they okayed that stipulation

15  as well, Your Honor.

16    THE COURT:  And those were all victims related to

17  Counts Six and Seven; correct?

18    MS. MCGRADY:  That's accurate, Your Honor.

19    THE COURT:  Is there any restitution request on

20  Counts One through Five?

21    MS. MCGRADY:  No, Your Honor.  We spoke about that

22  with Miss Tingey, and she doesn't wish to request restitution.

23    THE COURT:  Okay.

24    MS. MCGRADY:  We are requesting forfeiture in this

25  case, Your Honor.  There was a preliminary order of forfeiture

1    that was filed, and we are requesting forfeiture of the

2    electronic devices used to commit this offense.

3           As set forth in the government's sentencing

4    memorandum, Your Honor, as a result of the defendant's prior

5    state court conviction for battery with intent to commit rape,

6    it's the government's position that he is subject to enhanced

7    mandatory minimums as well as maximums on all seven counts, and

8    those are set forth in the memorandum.

9           And I supported why I believe the state court

10   conviction is going to trigger those enhancements, so I won't

11   address that now, because the government is requesting a

12   sentence that's in excess of the mandatory minimums.

13          The advisory guidelines in this case are life.  But

14   obviously, the crimes that he was convicted of don't carry a

15   life sentence, so then the guidelines become the maximum

16   possible penalty.  So for that reason, the government is

17   requesting that you impose a sentence of 320 years.

18          I understand that that is far in excess of what a

19   natural life sentence would be for Mr. Goodwin, but

20   nonetheless, such a sentence is necessary to achieve the goals

21   of sentencing and is warranted when consider the 3553(a)

22   factors.

23          I'll start with the bottom line, Your Honor.  This is

24   a very heinous and egregious offense.  I know the Court knows

25   that.  The defendant possessed and transported a number of

1    files of child pornography.  All of these files show young

2    children being subjected to horrific acts of sexual abuse.  He

3    possessed these terrible images and videos for his own sexual

4    pleasure.

5             Obviously, I know this Court knows this, but I always

6    like to reiterate it when we don't have them here in court to

7    give victims' impact statements.  But these are real children.

8    These are real children who have been exploited and abused and

9    then their abuse is being memorialized forever for people like

10   this defendant to use for their own sexual gratification, which

11   exactly -- which is exactly what he did in this case.

12            The child pornography industry is a horrific

13   industry.  And through his acts of possessing and transporting

14   these images, he's doing his part to perpetuate and support

15   that terrible industry.  It's an industry that creates

16   countless victims throughout this entire world.

17            You do have a few victims' impact statements from

18   some of those victims in the presentence report, and that gives

19   this Court some insight into the amount of pain and suffering

20   that comes with being a victim of child pornography.  This

21   really is the type of crime that's a life sentence for the

22   victims, because their painful moments are documented, and they

23   are living out there forever on the Internet.  And they are

24   never ever going to be able to change that.

25            And people like this defendant are going to keep

15

1   exploiting them through the possession and distribution of

2   these images on into the future.  And it is a horrible crime

3   that I would ask this Court to consider when fashioning an

4   appropriate sentence.

5            But what you have here, Your Honor, is not just that

6   crime that's serious in and of itself, you have somebody who

7   didn't just stop by possessing these images of child

8   pornography.  That was not good enough for this defendant.  He

9   had to decide to create some horrible images of his own using

10  the very own children that he had in his home.

11           The age of these victims is a very aggravating

12  factor.  His daughter was only 16 months old when he made the

13  decision to exploit her by taking terrible pictures of her.

14  There was a video that was played at trial.  It was one of the

15  government's exhibits.  I believe it was Exhibit 1060, which

16  was a video of the victim in her crib.  This was not a child

17  pornography video, but it showed her laying in her crib, crying

18  out for comfort, and it showed him walking in to the door.

19           And it's that video from the Government's standpoint

20  that's very heartbreaking, because it shows just how vulnerable

21  that little girl was.  She was completely reliant on her

22  caregivers for all her love and her support.  She didn't have

23  the verbal or physical skills to resist what the defendant was

24  doing to her or to tell her mom or anyone else what was

25  happening to her.  And essentially, it made her a perfect

1  victim for him, and he took full advantage of that.

2         He took the time that he was spending with his

3  daughter, and instead of loving and caring for her and

4  comforting her, he exploited her in one of the worst ways

5  possible.  He also did it to Karisa's six-year old daughter.

6  This was a little girl who was comfortable with him in her

7  home.  She should have been able to sit and play in her home in

8  peace without this defendant attempting to take pictures of her

9  genitals by taking pictures up her skirt, but that's exactly

10 what he did.  He took numerous different photographs of her

11 exploiting her every time.

12        You just heard the very powerful victim impact

13 statement that was given in court today by Karisa.  Her whole

14 family is a victim in this situation.  As she mentioned, she

15 loved and trusted this defendant, and he exploited their entire

16 family in a way that is completely unforgivable and in a way

17 that is going to have ramifications for them on into the

18 future.

19        It's difficult in a case like this for me to stand up

20 here and try to actually come up with the words to describe the

21 magnitude of a crime like this, and I just can't do it.  I will

22 just simply say that this was heinous and egregious crime that

23 deserves a very, very significant sentence.

24        This Court also has to be concerned about protecting

25 this community from this defendant.  He comes before the Court

having already been convicted of a very serious sex offense

involving him battering a female victim with the intent to rape

her.  You also have the evidence that was presented during

trial involving his conduct with the woman in Indiana where he

was attempting to get her to create child pornography of the

children in her home and send it to him.

We had some of the text messages where he was

specifically telling her what sexual acts to perform with the

children, and he wanted her to -- to memorialize that and send

it over to him, again, to use for his own sexual gratification.

So, essentially, Your Honor, you have someone who has

a demonstrated pattern of continuing to victimize people in the

community.  He victimized his own children in his home.  He

tried to victimize children he didn't even know.  He victimized

this female who was acquainted with him and spending time with

him.

What this shows the Court is he is an extreme danger

to the community.  He has been given rehabilitative

opportunities, and he has squandered them.  He has an

established pattern of violating the terms and conditions of

any supervised release that he's on.  He was obviously on a

parole when he committed this offense, which is an aggravating

factor.  He was on a supervised probation when he met the woman

in Indiana.  But none of these things and none of the safety

measures that were put into place to stop him from doing this

1    worked, because he simply refused to abide by any of the terms

2    and conditions that were given to him.

3         As he sits here today, he has shown no remorse or

4    accountability for his crimes.  He still continues to deny

5    wrongdoing in his battery with intent to commit rape case given

6    his commentary in the PSR.  And I think what this shows the

7    Court is that there is absolutely no reasonable chance that he

8    can or will be rehabilitated or that he will comply with any

9    conditions that are put in place.

10        So, the only way that this Court can ensure that we

11   are not back here with more children in our community being

12   victims is to make sure that he spends the rest of his life in

13   prison.

14        This sentence that the government is requesting would

15   ensure that he never gets out of prison, but it would also

16   serve the very important purpose of deterring other people in

17   the community from committing crimes like this.  There are very

18   few crimes that are worse than sexually exploiting vulnerable

19   children in our community, and this Court can send a message to

20   other offenders that if they engage in this conduct, that they

21   will be harshly, harshly punished.

22        I understand this Court is in an unusual situation

23   with the guideline being life but not having a life penalty

24   available to you.  So I would ask that when you assign a number

25   in this case, that it be extremely significant, because I do

19

1    think that this is an opportunity for this sentence to have a

2    very real deterrent effect.  And I did discuss that in my

3    sentencing memorandum, where very large sentences for crimes

4    like this have been upheld by the appellate courts and have not

5    been deemed cruel and unusual punishment.

6              And I just mention that briefly, because that was

7    something that counsel put in his sentencing memorandum.  And

8    I'm asking this Court to follow the government's

9    recommendation.  Thank you.

10             THE COURT:  Before you sit down, I do have a couple

11   questions.

12             MS. MCGRADY:  Yes, Your Honor.

13             THE COURT:  The 320 years that you are asking --

14             MS. MCGRADY:  Yeah.

15             THE COURT:  -- that's still within the guideline

16   range, as big as it is; isn't it?

17             MS. MCGRADY:  Yes, absolutely.

18             THE COURT:  I am just -- I am struggling wrapping my

19   head around that number.  I -- and I don't say that to make

20   light of anything that's happened in the case.

21             MS. MCGRADY:  Right.

22             THE COURT:  I am just having a hard time

23   distinguishing between a sentence of, say, 75 years, in this

24   case, and 320.  How does the 320 make a difference that the 75

25   doesn't?

1           MS. MCGRADY:  Well, I think it has a very real

2      deterrent effect like I'm talking about.  A large, large

3      sentence like that does send an extremely big message to the

4      community on what will happen if there's crimes like this.

5           In addition to that, because the Court doesn't have a

6      life sentence, the guideline range is the maximum penalty.

7           THE COURT:  I get that.

8           MS. MCGRADY:  And I just don't see any reason, in a

9      terrible case like this, where the government doesn't feel that

10     there's any mitigation for this Court to send the wrong message

11     by saying, "I'm going to give a below guideline sentence."

12          THE COURT:  That's something I'm struggling with on

13     the other side.

14          MS. MCGRADY:  Right.

15          THE COURT:  If I don't give 320 years, I don't want

16     it to seem like that's because I'm favoring the defendant in

17     this case.

18          MS. MCGRADY:  Right.  And that's -- that's why the

19     government is coming before you recommending that sentence.  I

20     understand the number is very large, but it is what the

21     guideline is, and I think it's appropriate.  And there is no

22     reason to deviate from that.

23          THE COURT:  Okay.

24          MS. MCGRADY:  Thank you, Your Honor.

25          THE COURT:  Thank you.  Mr. Murdoch.

1    MR. MURDOCH:  Thank you, Your Honor.

2         As I stated earlier, I will go through the points of

3    clarification that we have to the presentence investigation

4    report, and then I will get into my argument as far as the

5    sentencing goes.

6         The first clarification is on page 23.  Judge, will

7    you be pulling this up as I am talking about it?

8         THE COURT:  I am pulling it up right now.  Page 23?

9         MR. MURDOCH:  Yes.

10        THE COURT:  What paragraph?

11        MR. MURDOCH:  108.

12        THE COURT:  All right.  I have it.

13        MR. MURDOCH:  At the bottom of that paragraph, the

14   second to the last sentence states that the defendant referred

15   to himself at that time as a sex addict.

16        With these corrections, I am not disputing that those

17   statements are in a record.  What my client is disputing is

18   that he said these.  He believes that those were incorrectly

19   placed in a record.  And so he does not believe that he said

20   that.

21        The next one is on page 24.

22        THE COURT:  All right.

23        MR. MURDOCH:  And that's in paragraph 110.  About

24   one-third of the way down that paragraph, it states, "According

25   to records from the facility, he did not complete the sex

22

1     offender assessment program at NCI during the course of the

2     Rider, because he did not complete all of the required

3     assignments.  He did not complete the assignments as they

4     required him to discuss details of his offense which he was

5     advised against by counsel."

6              What I want to clarify there -- once again, I'm not

7     denying that that is in the record.  And what my client wanted

8     to clarify there was that the only assignments that were

9     incomplete was the journaling.  And what we want to highlight

10    there is that despite that, he still received a recommendation

11    for probation after the Rider.  Therefore, that must have shown

12    amenability to sex offender treatment.  And so that's the

13    clarification I wanted to make there.

14              The next one is on page 25.

15              THE COURT:  All right.

16              MR. MURDOCH:  In paragraph 113.  Once again, about a

17    third of the way down the paragraph, a sentence that begins

18    with "during."  It says, "During the course of the

19    full-disclosure sexual history polygraph, the defendant

20    indicated that he engaged in mutual sexual touching with his

21    sister as well as thumping and sex play with her Barbie dolls."

22              My client denies that he said that and believes that

23    the record of the polygraph that was included in the

24    psychosexual evaluation was incorrect.  And so once again, I am

25    not disputing that that's in the record, but my client believes

23

1    that that is an incorrect portion of the record.

2            THE COURT:  Is this the first time he's brought up

3    that alleged error?  I mean, that psychosexual is nine years

4    old.

5            MR. MURDOCH:  Oh, in this case, I am not sure --

6            THE COURT:  No, in any case.

7            MR. MURDOCH:  Frankly, I don't know if he brought

8    that up in the 2009 case.

9            THE COURT:  Okay.  It seems pretty easy for him to

10   deny it now if he didn't deny it then.

11           MR. MURDOCH:  I understand.  Yes, I understand.

12           One other clarification with that, going down a bit

13   more, it says, "He reported that he saw his younger sister

14   naked when she was taking a shower."  He does not deny that

15   that happened, but he wanted to clarify that that was by

16   accident as she was getting out of the shower.  He was not

17   spying on her in an effort to -- to view her.

18           THE COURT:  That seemed very clear from the rest of

19   that sentence.  "However, he noted he never peeped on her or

20   anyone else."

21           MR. MURDOCH:  Okay.

22           THE COURT:  The intent -- he's denying any intent

23   there.  I get that.

24           MR. MURDOCH:  Okay.  The last change or the last

25   clarification we have is on page 31.

24

1        THE COURT:  That's the final page?

2        MR. MURDOCH:  Yes.

3        THE COURT:  All right.

4        MR. MURDOCH:  In paragraph 154, it's discussing some

5   factors for the Court to take into account.  And factor number

6   three that is listed a little more than halfway down that

7   paragraph states that the defendant has shown his unwillingness

8   to participate in treatment and counseling and evidenced by his

9   prior failure to participate in sex offender treatment.

10       The defendant just disagrees with that statement.

11  That he wanted to make it clear to the Court that he did

12  participate on treatment on the Rider, and he was participating

13  afterwards in treatment until he was violated from the events

14  that happened in this case.

15       THE COURT:  Well, I understand that.  That particular

16  phrase is an opinion of the probation officer.  He can have a

17  different opinion, and there are other things that happened

18  besides the Rider.

19       MR. MURDOCH:  Yes.  And then that's what we wanted to

20  express, that that's -- that's his view on that.  Those are all

21  the clarifications we have to the report.

22       Now I'd like to address our argument as far as

23  sentencing goes.  And this case is unusual for me, and it's bit

24  of a -- it's a strange position to be making argument from in

25  the sense that my client has maintained his innocence from the

25

1    beginning of this case, and throughout the jury trial, and

2    still to this day maintains his innocence.  And I want to

3    respect that, and I want to honor that, and that's what I

4    intend to do here today.

5              Nevertheless, I have to talk about the crimes here,

6    because he went through the process.  He was found guilty of

7    these crimes.  And so what I want to clarify for the Court is

8    that when I am talking about the crimes that were committed

9    here and my client, I'm doing so from a place of acknowledging

10   that he was found guilty by a jury of these crimes, and I'm not

11   admitting, on his behalf, that he -- that he committed these

12   crimes or that he is somehow lessening his profession of

13   innocence in this case.

14             And as I consider this, the Court's aware that it

15   must take into account, when it's determining the sentence --

16   it needs to impose a sentence that is sufficient to achieve the

17   purposes of sentencing but no greater than necessary to achieve

18   those purposes.

19             And as I went through the government's sentencing

20   memorandum and listened to their argument today, frankly, I

21   cannot disagree with their characterization of the crimes in

22   this case, and sex abuse, and child pornography.  I -- they are

23   heinous.  They are horrible acts.

24             Nevertheless, I disagree with the sentence that they

25   are asking for.  And as I brought up in my sentencing

1   memorandum, I believe that either under the guidelines or the

2   300 -- the life recommended under the guidelines or 320 years,

3   as the government is recommending, is far in excess of what's

4   necessary to achieve the purposes of sentencing to achieve the

5   purposes of sentencing to the extent that for the Court to

6   impose either one of those sentence would violate my client's

7   Eighth Amendment right against self-incrimination.

8          I believe something far less than that, than what the

9   government is suggesting here, would achieve the sentencing

10  guidelines -- or the purposes of sentencing, and I would

11  suggest somewhere on the order of 15 to 20 years.

12         As I go through the factors, the 3553(a) factors, the

13  purposes of sentencing, and the Court has to impose a sentence

14  that is going to allow for rehabilitation and any kind of

15  treatment that would be necessary in this case.

16         My client has participated in sex offender treatment

17  in the past, and he would have an opportunity to participate in

18  that while he's in prison on these charges.  And it's my belief

19  that he could complete that treatment and be successful in that

20  treatment in a period of time that would be far less than life

21  or 320 years.

22         I think somewhere in the -- as I have suggested, 15

23  to 20 years would be sufficient for him to be able to get that

24  treatment and successfully complete it and still have a purpose

25  to that treatment, which would be, at some point, he would be

1   released back into the community and not be a risk to other

2   people, which goes to the second -- another purpose of

3   sentencing is the protection of society.

4           Mr. Goodwin can participate in treatment while he is

5   incarcerated.  Society will be protected.  They won't be at any

6   further risk from Mr. Goodwin.  And there are studies that show

7   that as sex offender grow older, their -- the chance of

8   reoffending goes down.

9           And Mr. Goodwin, I think under anyone's analysis, is

10  going to do a significant period of jail time or prison time on

11  this case.  He will be much older than he is now when he's

12  released; and, therefore, society would not be at risk from him

13  at that point for the reasons that I have discussed.

14          And the government brought up deterrence.  That the

15  sentence that they are suggesting is one that will have a

16  deterrent effect.  And no doubt there is a deterrent effect.

17  But the government suggests that for -- that for the more time

18  that is imposed in a sentence, the greater the deterrent

19  effect.

20          And I think that holds up for a while; but, at some

21  point, I think that breaks down.  Because I believe that

22  sentences can be so large that they become outlandish and

23  something that people would not even relate to as being in

24  reality.

25          And sentences -- a sentence that is suggest -- that

1     the government is suggesting I think falls into that category.

2     It would be so large that people would -- it wouldn't have the

3     same impact on people, and I think they may disregard that in

4     their thinking.  But the other point about greater sentences

5     providing greater deterrence is that I don't believe that

6     criminals go through a cost benefit analysis when they are

7     deciding whether to commit crimes.

8              I think a substantial sentence acts as a deterrent to

9     those who will be deterred.  But there are people who will not

10    be deterred, and any amount of time is not going to deter them.

11    And I don't believe that criminals differentiate between a

12    crime that -- or a sentence that would be in the 20-year range

13    as opposed to one in the 30-year range.  And say, "Well, if the

14    judge wasn't handing sentences that were down in the 30-year

15    range, I wouldn't do this crime" or "I would do this crime.

16    But where it's only a 20 year -- where they are only doing it

17    or giving sentences in the order of 20 years, then I'd go ahead

18    and do this crime."

19             And my point is this, that I don't believe they go

20    through that kind of analysis when they are deciding whether to

21    commit the crime.  And so the deterrent effect, aside from just

22    being a substantial sentence, breaks down.  And so it would be

23    greater than necessary to provide deterrence.

24             And lastly, the objective of sentencing is to impose

25    a just punishment.  And no doubt, these type of crimes need to

1  be punished.  But as I've discussed here, a significant amount

2  of jail is punishment.  And I can tell you that a punishment or

3  a sentence in the range that I'm suggesting, 15 to 20 years,

4  would be adequate punishment to my client.  And that is because

5  he's a human being, and he's going to feel being incarcerated.

6  He's already -- as a result of this case, he's been

7  incarcerated for coming up on two years now and undoubtedly

8  will be doing a lot more.  He's going to feel it.

9          As I spoke with my client and we talked about his

10  life and his history, something stood out to me.  And that was

11  his relationship with his grandmother.  He had a good

12  relationship with her.  He trusted her and could confide in her

13  and talk with her.  And she died a few years ago, and he took

14  that very hard.  That hit him.

15          And as he's talked about the rest of his family, his

16  parents, his siblings, he loves them.  Going to prison is going

17  to separate him from them, and it's very likely that no matter

18  what sentence the Court hands down today, he's probably never

19  going to embrace his parents again.  I think there's a safe bet

20  that they will not be living when he's released if he's

21  released.

22          His siblings may be around, but it's not going to be

23  the same, and he's going to feel that.  He will most likely

24  lose his children.  He's going to feel that.  He's going to

25  feel everything that comes with one's loss of freedom by being

1    incarcerated.  And so something past what I'm suggesting I
2    think is overkill and is too great of punishment in this case.
3    And just I think it would be way out of proportion with what
4    actually happened here.
5             So, Your Honor, for those reasons, I believe
6    Mr. Goodwin should be sentenced somewhere in the range of 15 to
7    20 years, including the 10-year consecutive sentence.  Thank
8    you.
9             THE COURT:  Thank you.
10            Mr. Goodwin, do you want to make a statement today?
11            THE DEFENDANT:  Yes, Your Honor.
12            THE COURT:  Go ahead.
13            THE DEFENDANT:  I have thought a lot about what to
14   say in this.  Almost from the first moment, I was offered a
15   deal if I'd plead guilty and take less time off.  But I can't
16   admit to doing something I never did.  I can't change a guilty
17   verdict.  I will fight for the rest of my life to prove my
18   innocence.  I can't change what's happened.
19            In my opinion, this has been about getting a
20   conviction at whatever cost necessary.  When I've spoken on the
21   phone, prosecution has threatened Karisa.  And I love my
22   children more than anything, and I would rather die the worst
23   possible way a million times over than do anything to hurt
24   them.
25            The prosecution said she can't think of a word to

1    describe any crime that harms a child.  And I 100 percent agree
2    with that.  It is the worst.  There is no worse crime.  I know
3    that the odds of me succeeding and proving my innocence is slim
4    to none, and I know that I will probably die in prison.  I will
5    never see my family.  I will never -- I will never see my kids
6    grow up, go to college, get married.

7           I have made mistakes in my past.  I haven't always
8    done what's right.  But as I said, I would rather die than
9    commit this crime.  And so I ask for the opportunity to prove
10   that.  I ask for the opportunity to hopefully see some of my
11   family again.  Thank you.

12          THE COURT:  All right.  To begin with, in this case,
13   the offense level is 43, with a Criminal History Category of V,
14   yields a guideline range of 3,720 months on Counts One Through
15   Seven, 10 years consecutive on Count Eight, as to Counts One
16   through Five.  That's where the government gets their 320
17   years.  Is that the total?

18          MS. MCGRADY:  Yes, Your Honor.

19          THE COURT:  As one of the factors to be considered by
20   the Court.  In addition to what has already been said, in
21   fashioning this sentence, the Court has taken into account
22   factors enumerated in 18 USC Section 3553(a), including the
23   following.

24          I have looked at the nature, circumstances, and
25   seriousness of the offense.  The defendant is before the Court

32

1   having been found guilty by a jury of four counts of sexual

2   exploitation of a minor, attempted sexual exploitation of a

3   minor, transportation of child pornography, and possession of

4   child pornography.

5           On four occasions, the defendant took photographs of

6   his 18-month-old biological daughter, which included depictions

7   of sexual contact and sexually explicit conduct.  He

8   additionally photographed his seven-year-old stepdaughter.

9   Further, a search of his electronic devices revealed 33 videos

10  and 445 images of verified child pornography.

11          The defendant was taken into federal custody on

12  March 28th, 2018, where he has remained without incident.  The

13  conspiracy theory or innocence theory propounded by the

14  defendant did not fly with the jury.  It does not fly with me.

15          Second, I looked at the history and characteristics

16  of the defendant.  The defendant is a 33-year-old male who has

17  been a lifelong resident of Idaho.  He was raised in a loving

18  and relatively stable environment by both of his parents and

19  alongside his eight siblings.

20          He reported he suffered some physical abuse during

21  adolescence as he was often picked on by his seven older

22  brothers.  He additionally reported a history of sexual abuse,

23  however he declined to provide additional information regarding

24  that abuse.

25          In August 2008, defendant married Melissa Goodwin.

One child was born to this union, and the marriage ended when the defendant was sentenced to incarceration through the state of Idaho.

Defendant then again a relationship with Karisa Tingey in approximately 2015. Two children have been born to this union. One of those children, the three-year-old daughter, was the victim in the instant offense which occurred when she was approximately 18 months old.

While he is in relatively good physical health, he has suffered from migraine headaches for approximately the past 26 years, which is treated with medication. He denies any alcohol abuse or the use of illegal controlled substances. He dropped out of high school, but he did ultimately obtained his GED in 2009 while incarcerated.

He has maintained sporadic employment history, admitting that he has had difficulty holding positions. He does not appear to have the ability to pay a fine at the time of sentencing given his lack of income due to incarceration.

The defendant has sustained a criminal history dating back to the age of 19 years old. At the age of 22, he was convicted of battery with intent to commit a rape for which he received 180 day retained jurisdiction. That sentence was suspended, and he was released on probation in April 2019 -- 2009.

By May of 2010, he had sustained a probation

1  violation for continuing to engage in sexual-related

2  misconduct.  The defendant solicited an adult female with minor

3  children to send sexually explicit images to him via the

4  Internet.  Although new criminal charges could have resulted

5  from those actions, ultimately, the violations were addressed

6  through a revocation of probation, and the defendant was

7  ordered to serve the previously suspended term of imprisonment.

8  He was paroled in July of 2014 and placed on supervision of the

9  state of Idaho.

10  Investigation into the instant offense indicates the

11  defendant was again engaging in illegal sexual activity as

12  early as June of 2015 as child pornography searches were

13  located on his personal computer.  By August 2017, his sexual

14  deviancy not only continued but escalated as evidenced sexual

15  contact and production of images related to such of his

16  biological 18-month-old daughter.

17  By his conduct to date, the defendant has shown

18  himself to be a perpetual sexual offender by his victimization

19  of both adult and minor victims.  He may deny that he called

20  himself a sex addict, but his conduct shows that he is.  He has

21  not only shown a disregard for the laws of this country and

22  orders of the Court but also for the safety of his community.

23  I have looked at the need for the sentence imposed to

24  reflect the seriousness of the offense, to promote respect for

25  the law, and to provide just punishment for the offense, to

1    afford adequate deterrence to criminal conduct, to protect the

2    public from further crimes of the defendant, and to provide the

3    defendant with needed educational or vocational training,

4    medical care, or other correctional treatment.  I have looked

5    at the sentence and sentencing range recommended by the United

6    States Sentencing Commission Guidelines together with the

7    sentencing goals and policies of the sentencing commission.

8         And I've looked at the need the avoid unwarranted

9    sentence disparities among defendants with similar records who

10   have been found guilty of similar conduct as well as the need

11   to provide restitution to any victims.

12        If I were to give the 320 years in this case, that's

13   certainly within the guideline range, and I think it is a

14   sentence that would be upheld on appeal.  My problem is

15   balancing that guideline range with the sufficient but not

16   greater than necessary standard.  That standard is much

17   different than a variation deserved by the defendant or mercy

18   shown to the defendant.

19        In other words, the sentence I intend to impose is

20   less than the guideline range requested by the government, but

21   only because I believe that the sentence I am going to give is

22   sufficient but not greater than necessary, not because I am

23   giving a downward adjustment or a deviation to benefit the

24   defendant.

25        The defendant has already repeatedly demonstrated to

1  me and to society that you cannot function within the norms and

2  the law with regard to your sexual behavior.  You have been

3  given multiple opportunities to correct your unlawful behavior

4  with the use of a retained jurisdiction, prison, and community

5  supervision.  You have chosen to not comply on repeated

6  occasions.

7          Your psychosexual evaluations, including diagnostic

8  tests and full disclosure polygraphs, along with your repeated

9  unlawful behavior, indicate you are a high to moderate risk to

10 reoffend.  Based on all of those factors, I have developed the

11 sentence that I think is appropriate in this case and that

12 meets the requirement of being sufficient but not greater than

13 necessary, and that sentence will be as follows.

14         On Counts One through Five, I am imposing 50 years on

15 each count to run concurrent to each other.

16         On Count Eight, I am imposing the 10-year mandatory

17 to run consecutive to Counts One through Five.

18         On Count Six, I am imposing the guideline maximum of

19 40 years.

20         And on Count Seven, the guideline maximum of 20

21 years.  Those two counts I will run concurrent to each other

22 but consecutive to Counts One through Five and Eight.

23         That gives a total of 100 years that I am imposing as

24 a sentence in this case.  I will ask the defendant to stand for

25 sentencing.

37

1    The defendant, Lex Bennett Goodwin, having been found
2    guilty by a jury of Counts One through Eight of the Second
3    Superseding Indictment and the Court being satisfied that you
4    are guilty as charged, I hereby order and adjudge as follows.
5    Pursuant to the Sentencing Reform Act of 1984, it is
6    the judgment this Court that the defendant, Lex Bennett
7    Goodwin, is hereby committed to the custody of the Bureau of
8    Prisons to be imprisoned for a total of 100 years as follows.
9    Counts One through Five, 50 years, plus the mandatory
10   consecutive sentence of 10 years pursuant to 18 USC Section
11   2260(a) on each count.  Counts One through Five will run
12   concurrently.  Count Eight will run consecutive.
13   Count Six will be a sentence of 40 years and Count
14   Seven will be a sentence of 20 years.  Those two to run
15   concurrently with each other but consecutive to the other
16   counts.
17   It is further ordered defendant shall pay to the
18   United States a special assessment -- counsel, I'm showing
19   35,800; is that correct?
20   MS. MCGRADY:  Yes, Your Honor.  I think it's $35,500.
21   Is that what you said?
22   THE COURT:  38,000 -- 358 is what I said, but I'm
23   dyslexic sometimes, so I want to make sure I have got it right.
24   MS. MCGRADY:  Oh, so it's 5,000 for this being a
25   child-related crime and a hundred regular special assessment.

38

1    So I think you are right.  I think that's correct.

2                    THE COURT:  35,800.

3                    MS. MCGRADY:  Yes.  I believe that's correct.

4                    THE COURT:  All right.  That amount shall be due

5    immediately.  The Court finds the defendant does not have the

6    ability to pay a fine.  The Court will waive the fine in this

7    case.

8                    It is further ordered defendant shall make

9    restitution to the Clerk of the United States District Court in

10   the amount -- in the stipulated amount of $5,000.

11                   Any payment that is not payment in full shall be

12   divided proportionately among the victims.  The Court finds

13   defendant does not have the ability to pay interest and the

14   Court will waive the interest requirement.

15                   All monetary penalties are due and payable

16   immediately.  However, having considered defendant's financial

17   resources, the Court orders payment under the following

18   schedule unless modified by the Court.

19                   While in custody, the defendant shall submit nominal

20   payments of not less than $25 per quarter pursuant to the

21   Bureau of Prisons' Inmate Financial Responsibility Program.

22                   During the term of supervised release, which is still

23   to come, defendant shall submit nominal monthly payments of

24   10 percent of gross income but not less than $25 per month.

25   The foregoing does not preclude collection efforts under 18 USC

39

1   Section 3613.

2            Upon release from imprisonment, defendant shall be

3   placed on supervised release for a term of life.  This term

4   consists of life on each of Counts One through Seven and each

5   of those will run concurrently.

6            Within 72 hours of release from the custody of the

7   Bureau of Prisons, defendant shall report in person to the

8   probation office in the district to which the defendant is

9   released.

10           During the time of supervised release, the defendant

11  must comply with all mandatory, standard, and special terms of

12  supervised release as stated in the presentence investigation

13  report, as outlined in the judgment and otherwise stated here

14  in open court today.

15           Counsel, have you reviewed those terms and conditions

16  with your client?

17           MR. MURDOCH:  I have, Your Honor.

18           THE COURT:  Does he have any objections to them?

19           MR. MURDOCH:  No, Your Honor.

20           THE COURT:  Mr. Goodwin, do you understand if you

21  violate the terms of your supervised release, you could be

22  brought back before the Court and a further sentence of

23  incarceration may be imposed?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  You have agreed to the forfeiture

1   allegation in the indictment.  Accordingly, the property
2   identified in the plea agreement and the preliminary order of
3   forfeiture is deemed forfeited and a final order of forfeiture
4   will now issue.
5           You do have the right to appeal your conviction and
6   your sentence.  Any notice of appeal must be filed within 14
7   days after judgment is entered in this case.  If you are unable
8   to pay the cost of an appeal, you may apply for leave to appeal
9   without cost.  If you make the request and if you qualify, the
10  Clerk of the Court will arrange legal representation for you
11  and will prepare and file a notice of appeal on your behalf.
12          Counsel, is there anything further?
13          MS. MCGRADY:  No, Your Honor.  Thank you.
14          THE COURT:  Counsel.
15          MR. MURDOCH:  No, Your Honor.
16          THE COURT:  Court is adjourned.
17      (Recess 4:00 p.m.)
18
19
20
21
22
23
24
25

1                              --oOo--

2                   COURT REPORTER'S CERTIFICATE

3

4        I, KATHERINE EISMANN, certify that the foregoing is a

5   correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8   Date:  October 7, 2019.

9                              _____

10

11                             Katherine Eismann, CRR, RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

049

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>LEX BENNETT GOODWIN,<br><br>    Defendant. | Case No. 4:17-cr-00296-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff United States of America's ("United States" or "Government") Motion in Limine to Admit "Other Act" Evidence. Dkt. 40.[1]

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(2)(ii).

For the reasons outlined below, the Court will GRANT in PART and DENY in PART the Motion.

///

---

[1] While the United States' Motion itself is found at Docket 40, the brief was previously filed under seal as Docket 28: "Notice of Intent to Admit 'Other Act' Evidence."

## II. BACKGROUND

### A. Procedural Background

On July, 24, 2018, the federal grand jury sitting in Pocatello, Idaho returned an eight-count Second Superseding Indictment against Defendant Lex Goodwin. Dkt. 17.

In Counts one through four, the Indictment alleges that Goodwin produced child pornography images of "Jane Doe I" on or about August 3, 2017, August 12, 2017, August 13, 2017, and September 30, 2017. In count five, the Indictment alleges that Goodwin attempted to produce child pornography images of "Jane Doe II" on or about August 13, 2017. In count six, the Indictment alleges that on or between August 12, 2016, and September 20, 2017, Goodwin knowingly transported child pornography in interstate commerce. In count seven, the Indictment alleges that Goodwin possessed images of child pornography on his Samsung Galaxy S7 cellphone, on a Gateway laptop computer that he used and accessed, and within two separate Google accounts. In count eight, the Indictment alleges that Goodwin committed the felony offenses charged in count one through count five at times when he was required by law to register as a sex offender.

On August 7, 2018, Goodwin entered a plea of not guilty to the Second Superseding Indictment. Dkt. 20. After granting numerous motions to continue (Dkts. 22, 24, 32) the Court set a date of May 20, 2019, for trial. Dkt. 32.

Anticipating trial, the United States filed a Notice of Intent to Admit 'Other Act' Evidence. Dkt. 28. As it became apparent that this case would, in fact, proceed to trial, the United States filed a formal Motion seeking to admit this "other act" evidence. Dkt. 40.

### B. Factual Background

The Court recognizes that the following recitation of the underlying facts is repugnant. Additionally, the Court wishes to limit references to the minor victims in this case as much as possible. That said, background and context are necessary to understand the United States' Motion in Limine and the Court's ruling on the same.

On September 1, 2017, the National Center for Missing and Exploited Children ("NCMEC") received a report from Google indicating that someone had uploaded child pornography to the Google account lexinpocatello@gmail.com. According to the report, four images of child pornography depicting a female child approximately eighteen months old were uploaded to the Google account on August 3, 2017. Exchangeable Image File Format ("Exif")[2] data associated with the four images shows that the images were created on August 3, 2017, less than three hours prior to being uploaded to the Google account. Exif data also shows that the images were created using a camera model SM-G930P, which is the same camera found on a Samsung Galaxy S7 cellphone.

Special Agent Kris Knight with Homeland Security Investigations was assigned to follow-up on the report from NCMEC. SA Knight learned that the IP address associated with the upload of the child pornography to the Google account was tied to the residence of K.T., Goodwin's girlfriend, in Rupert, Idaho. SA Knight also learned that Goodwin

---

[2] Exif data is a standard that specifies the formats for images, sound, and ancillary tags used by digital cameras (including smartphones). Exif data can show the date and time a picture was taken, the type of camera used to take the picture, and, under certain conditions, even the GPS coordinates showing the location where the picture was taken.

MEMORANDUM DECISION AND ORDER - 3

052

was a registered sex offender and on state parole for battery with intent to commit rape. The victim in that case was an adult female.

SA Knight contacted Goodwin's parole officer and learned that he (Goodwin) lived in Pocatello but often spent time at K.T.'s residence in Rupert. SA Knight learned that two female children, one eighteen months old (hereinafter "Jane Doe I") and one seven years old (hereinafter "Jane Doe II") also lived at the residence. The four child pornography images associated with the report from Google were later identified to be sexually explicit images of "Jane Doe I."

SA Agent Knight obtained search warrants for Goodwin's residence in Pocatello, K.T.'s residence in Rupert, and the lexinpocatello@gmail.com Google account. The residential warrants were served on October 5, 2017. The same day that the warrants were executed, SA Knight met Goodwin at the parole office and interviewed him. Goodwin was advised of his Miranda rights and agreed to waive them.

Following the interview—in which Goodwin lied to SA Knight concerning the whereabouts of his phone and his use of the email address lexinpocatello@gmail.com— Goodwin's cellphone, his Gateway computer, and the other electronic devices seized during the investigation were submitted for forensic examination. The forensic examination of Goodwin's electronic devices, as well as additional records received from Google in response to a search warrant, revealed numerous files of child pornography within the lexinpocatello@gmail.com account. SA Knight also located the four pornographic images of "Jane Doe I" that were reported to NCMEC by Google. Within the same Google account, SA Knight found several emails from

MEMORANDUM DECISION AND ORDER - 4

lexinpocatello@gmail.com to various females discussing meeting up to engage in sexual activity. SA Knight also found an email from the email address lexinpocatello@gmail.com to the email address lexgoodwin85@gmail.com. Attached to the email was a word document that contained a resume for Lex Goodwin. On August 5, 2017, the lexinpocatello@gmail.com account received a message from Google stating, "Your library is now being shared with lexgoodwin85@gmail.com."

Based on the association with the lexinpocatello account and the lexgoodwin85 account, SA Knight obtained a search warrant for the lexgoodwin85@gmail.com account and reviewed the documents supplied by Google in response to that warrant. SA Knight located numerous files of child pornography within this second account. SA Knight located the same four child pornography files depicting "Jane Doe I" that were the subject of the Google NCMEC report. SA Knight also located several other sexually explicit images of "Jane Doe I." Exif data from those images shows that they were taken on August 13, 2017, and September 30, 2017, using the same type of camera that is found on a Samsung Galaxy S7 cellphone.

Within the same Google account, SA Knight located a series of pictures showing a female child wearing a pink skirt and a blue shirt. The child is shown sitting with her legs apart, and in some of the pictures the child's underwear is moved off to the side to where her genitals are almost exposed. It appears that the images were taken surreptitiously. K.T. subsequently identified the child in these images as "Jane Doe II."

On Goodwin's Samsung S7 cellphone, SA Knight located several of the same sexually explicit images of "Jane Doe I" that were located within the

MEMORANDUM DECISION AND ORDER - 5

lexgoodwin85@gmail.com account. On Goodwin's cellphone, SA Knight also located a set of three images depicting an adult male posing with a pair of child's underwear. The child's underwear in this picture were later identified as belonging to "Jane Doe II" and the same underwear was collected from K.T.'s residence. Exif data from the images shows that they were created using a Samsung S7 cellphone on August 23, 2017. The Exif data also contains GPS coordinates showing that the pictures were taken at K.T.'s residence in Rupert.

Finally, on the Gateway computer, SA Knight located several files of child pornography. Most of the child pornography was located within an application called Blue Stacks, which is a program that allows a PC computer to operate like an Android cellular phone. SA Knight also located Google search history and internet website history related to child pornography and a sexual interest in children. The internet history is dated between June 30, 2015, and July 3, 2015.

### III. LEGAL STANDARD

#### A. Motion in Limine Standard

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cty.*, No. 4:15-CV-00156-DCN, 2018 WL 1144970, at *1 (D. Idaho Mar. 2, 2018) (citing *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a procedural mechanism to limit in advance testimony or

evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir.

2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Because "[a]n in limine order precluding the admission of evidence or testimony is

an evidentiary ruling," *United States v. Komisaruk*, 885 F.2d 490, 493 (9th Cir. 1989)

(citation omitted) "a district court has discretion in ruling on a motion in limine." *United*

*States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in limine rulings are

preliminary and, therefore, "are not binding on the trial judge [who] may always change

his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3

(2000).

### B. Federal Rule of Evidence 404(b)

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of

evidence concerning "other crimes, wrongs, or acts" committed by a defendant. That

Rule provides as follows:

> (1) Evidence of a crime, wrong, or other act is not admissible to prove a
> person's character in order to show that on a particular occasion the person
> acted in accordance with the character.
> (2) This evidence may be admissible for another purpose, such as proving
> motive, opportunity, intent, preparation, plan, knowledge, identity, absence
> of mistake, or lack of accident.

Fed. R. Evid. 404(b)(1)-(2). The Ninth Circuit has specified that "Rule 404(b) is a rule of

inclusion." *United States v. Alfonso*, 759 F.2d 728, 739 (9th Cir. 1985). "Thus, evidence

of past wrongful acts is admissible if it is relevant to an issue other than the defendant's

character or criminal propensity." *Id.*

MEMORANDUM DECISION AND ORDER - 7

To prove that the evidence is offered for one of the permitted purposes under Rule 404(b), the Government must show that the evidence: (1) is offered to prove a material element of the current offense; (2) if admitted to prove intent, is similar to the offense charged; (3) is based on sufficient evidence; and (4) is not too remote in time. *United States v. Ramirez–Robles*, 386 F.3d 1234, 1242 (9th Cir. 2004). "The [G]overnment must also show that the evidence satisfies Federal Rule of Evidence 403 such that its probative value is not outweighed by its prejudicial effect." *Id.*, *see also United States v. Benitez*, No. 1:17-CR-00348-BLW, 2018 WL 6591917, at *2 (D. Idaho Dec. 14, 2018).

### C. Federal Rule of Evidence 403

If evidence of prior acts is found to be probative of motive, intent, plan, or lack of accident under Rule 404(b), the Court must consider whether the evidence is nevertheless barred under Federal Rule of Evidence 403. This Rule provides that the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Unfair prejudice refers to an undue tendency to influence a decision on an improper basis, such as an emotional response, or with evidence designed to elicit a response from the jurors that is not justified by the evidence. *See U.S. v. Ellis*, 147 F.3d 1131, 1135 (9th Cir. 1998). Even if there is only a modest likelihood of unfair prejudice or a small risk of misleading the jury, evidence that presents only slight probative value must be excluded. *See U.S. v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).

MEMORANDUM DECISION AND ORDER - 8

Additionally, cumulative evidence may also be excluded because it does no more than replicate other admitted evidence. *See, U.S. v. Ives*, 609 F.2d 930, 933 (9th Cir. 1979).

### D. Federal Rule of Evidence 414

Finally, Federal Rule of Evidence 414 provides that, in a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation on any matter to which it is relevant. "Child molestation" includes a crime under federal or state law involving:

> (A) Any conduct prohibited by 18 U.S.C. chapter 109A and committed with a child;
> (B) Any conduct prohibited by 18 U.S.C. chapter 110;
> (C) Contact between any part of the defendant's body – or an object – and a child's genitals or anus;
> (D) Contact between the defendant's genitals or anus and any part of a child's body;
> (E) Deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on a child, or;
> (F) An attempt or conspiracy to engage in conduct described in subparagraphs (A) – (E).

Rule 414 specifically allows the Government to use evidence of a defendant's other acts for the purpose of demonstrating to the jury that the defendant had a disposition of character, or propensity to commit crimes involving child molestation. Prior to 1994, admission of a defendant's prior crimes or acts was governed by Rule 404(b), which generally disallows such evidence when used to prove character in order to show action in conformity therewith. *See United States v. LeMay*, 260 F.3d 1018, 1024 (9th Cir. 2001). Rule 414 "changes this general rule with respect to child molestation cases." *Id.*

MEMORANDUM DECISION AND ORDER - 9

To be admissible, the evidence of other acts of child molestation must be relevant under Federal Rule of Criminal Procedure 104(b). *See United States v. Norris*, 428 F.3d 907, 913-914 (9th Cir. 2005). In determining whether there is sufficient evidence to satisfy Rule 104(b), a district court "is not required to make any preliminary finding that the government has proved the conditional fact." *Id.* Instead, the court "simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact" – that the defendant committed the other act of molestation – "by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). Under Rule 414(a), "the key to admissibility is relevance, and no independent evidence of the commission of the prior bad act is required." *Id.* at 913. The other act of child molestation may be proved through the introduction of a judgment of conviction, through the testimony of the victim, or even through the defendant's own admissions. *See United States v. Redlightening*, 624 F.3d 1090, 1120 (9th Cir. 2010).

## IV. ANALYSIS

In its motion, the Government asserts that it intends to introduce "other act" evidence in four circumstances. The Court will address each in turn.

### A. Evidence that between May and June of 2009, the defendant communicated electronically with T.C. and discussed his sexual interest in children and requested that T.C. take nude photographs of children and send them to him.

T.C. is an adult woman living in Indiana. Goodwin met T.C. online sometime

MEMORANDUM DECISION AND ORDER - 10

during 2008-2009.[3] The two became online friends and subsequently began texting and calling each other on the phone. Goodwin and T.C. eventually began having conversations of a sexual nature.

At some point, Goodwin began making comments that were disturbing to T.C. For example, Goodwin stated that he had been having sexual fantasies about children since he was a child. At the time, T.C. had two daughters who were ages 11 and 13. Goodwin referenced wanting T.C. to take nude pictures of her children, her nieces when she babysat them, or any other children who she was watching. Goodwin made comments about wanting to take T.C.'s child's virginity, have a baby with her minor daughter, and that he wanted T.C. to move to Idaho and have a child with him so he could rape their baby. During one conversation—in which T.C. told Goodwin she was at Walmart— Goodwin told T.C. to find a child at the store, take the child into the dressing room, take nude photographs of the child, and send the photographs to him. Goodwin also told T.C. how to access specific child pornography websites.

Ultimately, T.C. contacted Goodwin's probation officer and the Pocatello Police Department. When interviewed, Goodwin initially denied knowing T.C. Later he admitted that he knew her. Goodwin also initially denied that he had said anything relative to T.C.'s daughters or regarding child pornography. When confronted with evidence—in the form of text messages—Goodwin claimed that T.C. had fantasies about

---

[3] It is not entirely clear from the record when Goodwin and T.C. met, however, it appears they met in late 2008 or early 2009.

MEMORANDUM DECISION AND ORDER - 11

060

children and sex and the only reason he said those types of things was because he thought that was what T.C. wanted to hear and that he wanted to keep her happy so that she would provide him with financial assistance.

Goodwin was never charged with a crime related to his conduct with T.C. He was, however, charged with violating his probation, and the conduct with T.C. was included in the report of violation from his probation officer. Goodwin was ultimately sent to prison following the probation violation, and remained there until he was paroled in approximately July of 2014.

The United States wishes to introduce evidence of Goodwin's communications with T.C. during May and June of 2009. Because the grand jury in this case indicted Goodwin on criminal charges regarding the production, transportation, and possession of child pornography—offenses which are violations of 18 U.S.C. chapter 110 and are therefore considered "child molestation" offenses under Rule 414—and because Goodwin's request that T.C. take nude photographs of her children would also be a violation of 18 U.S.C. chapter 110 (even though Goodwin was never formally charged) this conduct is admissible under Rule 414. However, the Court must still determine if the evidence is relevant and admissible under Rule 404(b) and Rule 403.

Goodwin asserts that the information regarding T.C. is irrelevant, old, and that allowing the United States to introduce it would be unfairly prejudicial. In Goodwin's view, the United States seeks to introduce his old conversations with T.C. to show that he had a sexual interest in children and that he knew search terms to find child pornography. Because the United States will submit other evidence to prove both of these points,

MEMORANDUM DECISION AND ORDER - 12

Goodwin asserts that these conversations are duplicative, and the probative value is minimal. Further, Goodwin argues that introducing such conversations is prejudicial as it will inflame the jury and "move jurors to make an emotional decision about Defendant's guilt," Dkt. 42, at 3.

It is true that the United States intends to introduce evidence that Goodwin produced and stored child pornography on his phone and that he accessed child pornography (in addition to the images of Jane Doe I and Jane Doe II) on his phone and computer. The Court agrees that this information would likely be sufficient to establish that Goodwin had a sexual interest in children and knew how to access child pornography.

That said, it does not appear—as Goodwin suggests—that the Government's sole purpose in presenting this material is to show that Goodwin had an interest in (and knew how to access) child pornography. The United States expresses concern that Goodwin will argue that he did not upload the images on his phone (that another person did or that his phone was hacked), and that the images and accounts on the computer (as it was a shared computed) are likewise not his.

The Court sees this as a realistic concern. First, while there is no way to know whether Goodwin will actually make such an argument at trial, waiting until that time to make such a ruling is not feasible. T.C. lives in Indiana. The Court cannot wait until Goodwin asserts such a defense to determine whether T.C. will be allowed to testify on these matters—by then it will be too late. Furthermore, it is within the United States' purview to anticipate, and address, defenses in its case-in-chief. *United States v. Curtin*,

MEMORANDUM DECISION AND ORDER - 13

489 F.3d 935, 940 (9th Cir. 2007) ("Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense.").

Second, even with the overwhelming evidence (including Exif data) that shows Goodwin's phone, email accounts, and a computer he had access to all contained child pornography, the Court has not seen as much evidence linking Goodwin to those items—aside from the normal inference that a person uses his or her own devices and accounts.[4] In short, it appears the evidence regarding Goodwin's conversations with T.C. is critical to the Government's case.

More importantly, however, the Court finds that this information is highly relevant, as Goodwin's prior behavior and communications with T.C. are strikingly similar to the charges in this case. The prior conversations are probative on the issue of whether Goodwin was the person responsible for producing the images of the victims, whether he intended the images to be sexual in nature, and whether he knowingly and intentionally possessed and transported other images of child pornography. Accordingly, it seems clear that the United States does not want to present this evidence simply to paint Goodwin in a bad light, but to show Goodwin's "motive, intent, knowledge and identity as it relates to counts one through five, as well as his motive, intent, knowledge, identity, and absence of mistake as it relates to the other counts, which allege possession and

---

[4] To be sure, the Court is not weighing the evidence at this time, but rather finds that this type of evidence may be relevant (regardless of what weight it is given) to the matters at hand.

transportation of child pornography." Dkt. 28, at 15. This is a reasonable application of Rule 404(b).

While there may be some prejudicial effect in light of the disturbing content of the communications, this is unfortunately a case where much more disturbing content will be presented to the jury. After all, these communications contain no images or videos—they are simply text messages.[5] In sum, this material, in and of itself, will not be so inflammatory as to prohibit its use and the probative value outweighs any prejudice that may result. This portion of the United States Motion is GRANTED.

### B. Evidence that there were images found on the defendant's Samsung cellphone showing "Jane Doe II's" underwear on the defendant's bare and erect penis.

In its second request, the United States explains that it intends to introduce three images depicting "Jane Doe II's" underwear on Goodwin's bare and erect penis, testimony regarding where the images were located, and what Exif data was found in the images.

Goodwin claims that the only reason the Government would need this information is to prove when, where, and how the images were taken —and on what type of device— and that, similar to the above, these concepts can be proven via other means. Because the images themselves are irrelevant to establishing the type of camera at issue and where the

---

[5] Along with the text messages there are police reports and an audio recording. The admissibility of the latter materials is not before the Court at this time, however if foundation, authenticity, and relevance can be established at trial, these materials could be introduced into evidence consistent with this opinion.

MEMORANDUM DECISION AND ORDER - 15

images were taken, Goodwin asserts that the "images of the underwear and the penis will do [nothing] to assist the jury to decide whether the elements of the charges have been proven." Dkt. 42, at 3.

The Court disagrees. To be sure, one purpose of introducing these images is to establish that these images were taken with the same type of camera, in the same location, and during the same time frame as other images of Jane Doe I and Jane Doe II. This information is relevant and necessary to the Government's case and its ability to tie Goodwin to the images and accounts that form the basis of the charged crimes.

However, a second, and more important reason these pictures are relevant is to show Goodwin's propensity for, and interest in, children and sex. The images depict underwear belonging to "Jane Doe II," who is the victim identified in count 5. These images are, therefore, not ancillary to the issues in this case, but are part and parcel to charges of child pornography. While there is no child in these particular pictures, they are sexual in nature, and when looked at under the totality of the circumstances, are intertwined with the other photos Goodwin took of Jane Doe II in an effort to produce child pornography.

Citing *United States v. Dorsey*, the Government points out that the Ninth Circuit has held that there are "[t]wo general categories of other act evidence" that may be considered "inextricably intertwined" with the charged crime and, thus, exempted from the requirements of Rule 404(b). 677 F.3d 944, 951 (9th Cir. 2012). The first category is other act evidence that may constitute "a part of the transaction that serves as the basis for the criminal charge." *Id*. at 951 (citing *United States v. Vizcarra-Martinez*, 66 F.3d 1006,

MEMORANDUM DECISION AND ORDER - 16

1012 (9th Cir. 1995)). The second category is other act evidence "that may be necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Dorsey*, 677 F.3d at 951 (citing *Vizcarra- Martinez*, 66 F.3d at 1012-13).

Under the circumstances, the Court must agree. As noted above, these images depict behavior that is consistent with an interest in children and sex and are part of the story regarding the crime Goodwin is charged with—in other words, this evidence is related to "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Accordingly, the Court finds that these images are not excluded under Rule 404(b). This portion of the United States' Motion is GRANTED.

### C. Evidence of emails sent from the lexinpocatello@gmail.com account to various females requesting to engage in sexual activity.

In this request, the Government asks for a ruling that it be allowed to introduce evidence of emails sent from one of Goodwin's email accounts to adult women regarding sexual activity. The emails at issue were sent in July 2017 and appear to be communications in response to Craigslist's ads propositioning sex.

The government contends that—like the images of the underwear discussed above—these emails are inextricable intertwined with the charged conduct and not subject to Rule 404(b). In its estimation, the fact that several files of child pornography—including images of Jane Doe I—are located within this same email account cuts in favor of a finding that these emails are part of the whole story. Additionally, the Government

MEMORANDUM DECISION AND ORDER - 17

asserts that it needs to be able to introduce such emails to illustrate that Goodwin was the owner/operator of this email account.[6]

The Court disagrees. The emails from Goodwin to other women have no bearing on this case. Frankly, the type of behavior Goodwin engaged in there was not illegal. More importantly—addressing the argument that these emails prove ownership—the Government already intends to introduce other emails[7] to establish that Goodwin was the owner and operator of this account. These emails to and from other women, therefore, would be redundant, irrelevant, and potentially prejudicial.[8]

Where the conduct outlined in these emails is not intertwined with the current charges, the Court finds that this evidence does fall under Rule 404(b). Furthermore, as this conduct is not even related to the issues of child pornography, it also is irrelevant under Rule 403. The Court, therefore will not allow it to be introduced into evidence.

*If* Goodwin does take the position that the lexinpocatello@gmail.com account is not his, that others used the account, that it was shut down/inactive, or that the

---

[6] The Government intends to introduce emails that reference Goodwin being from Pocatello, and emails that clearly show that the communications are from a male to females (in an effort to refute Goodwin's [anticipated] argument that he did not send those emails). These emails were sent in July 2017, less than one month before the images of Jane Doe I were taken and uploaded.

[7] The United States can introduce emails that include Goodwin's resume, emails that show the various accounts were "shared" or "synced," emails showing the images of Jane Doe I and/or Jane Doe II, or any other emails it deems necessary as long as such emails do not include material concerning solely potential sexual encounters with adults.

[8] Although as the conduct is technically legal, there should not be any real prejudice that would result from sharing such information.

MEMORANDUM DECISION AND ORDER - 18

aforementioned emails do not clearly establish that he was the primary user of the account—i.e. if he "opens the door"—the Court would entertain a renewed motion at trial to introduce this evidence. Any such motion must be made outside the presence of the jury.

The Government's request regarding emails to adult females requesting to engage in sexual activity is DENIED.

### D. Evidence of search terms and internet history that were found on the Gateway laptop computer that relate to child pornography and a sexual interest in children.

In its final request, the Government explains that it intends to introduce evidence of certain search terms and internet browser history found on the Gateway laptop. The search terms at issue relate to child pornography and a sexual interest in children. The Government again alleges that this information serves as direct evidence of the crimes at issue and is not 404(b) evidence. The government claims that even if this information was subject to Rule 404(b), it would nonetheless be admissible as it is highly probative of Goodwin's motive, knowledge, intent, and lack of mistake regarding the crimes charged.

The Court disagrees. To be clear, the problem is not that the Government's position is misplaced—such evidence has been allowed under similar circumstances[9]—

---

[9] *See United States v. Cunningham*, 607 F. App'x 715, 716 (9th Cir. 2015) (holding that evidence the defendant purchased an online video depicting child pornography was admissible during his trial on production of child pornography charges because the evidence demonstrated a sexual interest in children and that the defendant did not inadvertently take pictures of the child victim); *United States v. Tanguay*, 982 F. Supp. 2d 119, 122 (D.N.H. 2013) (holding that evidence found

MEMORANDUM DECISION AND ORDER - 19

but that certain aspects of its position will be proved via other means and that other aspects have yet to be established.

First, there is no reason to introduce this evidence to show that Goodwin had a sexual interest in children or that he knew how to access child pornography. Goodwin's sexual interest in children will be apparent from all the other evidence in this case. Additionally, the specific fact that Goodwin knew terms to search will also likely come into evidence via T.C.'s testimony regarding the same. In short, this duplicative evidence is unnecessary.

Second, and more importantly, while there is evidence showing that Goodwin used the Gateway laptop at issue, there is also evidence that other individuals used this particular laptop as well. Allowing the Government to introduce this evidence would, therefore, be unfairly prejudicial to Goodwin unless it can somehow tie this search history directly to him.

The Government does not dispute that other people may have had access to the Gateway laptop, but argues that the search terms it seeks to introduce are indicative of the behavior that Goodwin engaged in in this case, and thus logically came from him. This internet history, however, occurred between June 30, 2015, and July 5, 2015—over two years before the events in question here—and is a small snapshot in time. To be sure,

---

on the defendant's computer involving bookmarks to websites with names that suggested sexually explicit material involving children was admissible to show that the defendant knowingly possessed child pornography); *United States v. Hite*, 916 F. Supp. 2d 110, 120 (D.D.C. 2013) (holding that browser history indicative of child pornography was admissible to prove the defendant's intent to entice or coerce a minor to engage in sexual activity).

MEMORANDUM DECISION AND ORDER - 20

there are some search terms that are more indicative of the type of behavior Goodwin is charged with under the Indictment, but there are other terms which are more general pornography terms.

Because of the timing issue, as well as the uncertainty surrounding who had access to the laptop, the Court will not allow this evidence in at this time. However, if the Government can tie the search terms and browser history *directly* to Goodwin,[10] the Court's decision may change. Until that happens, however, this request is DENIED. During trial, if the United States believes it has proffered enough evidence to reliably establish this point and wishes to introduce the search terms, it must do so by a motion outside the presence of the jury. Additionally, if Goodwin asserts in his case-in-chief that he doesn't know how to research child pornography or that he would never engage in such research, the Government may be able to argue that Goodwin has opened the door sufficiently to allow it to put the search history into evidence. Again, such an argument must first be made outside the presence of the jury.

### V. ORDER

The Court HEREBY ORDERS:

1. The United States' Motion in Limine (Dkt. 40) is GRANTED in PART and

---

[10] For example, if the United States introduces evidence that during the relevant time (in 2015) the Gateway laptop was kept at only one house and Goodwin was the sole occupant of that house, or if it can illicit testimony that no other individuals used that laptop at that time, such would likely be sufficient to establish the fact that the search history came from Goodwin. Absent such a showing, however, the Court will not allow speculative evidence to be presented.

MEMORANDUM DECISION AND ORDER - 21

DENIED in PART as outlined above.

DATED: May 13, 2019

David C. Nye
Chief U.S. District Court Judge

## CERTIFICATION OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 19, 2020.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants are not registered CM/ECF users. I mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participant on November 19, 2020.

Lex Bennett Goodwin, #19479-023
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808

 s/Andrew Parnes
Andrew Parnes